**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO. 19-cv-21486-CMA**

| | |
|---|---|
| **JANE DOE,** | **Miami, Florida** |
| **Plaintiff,** | **August 29, 2019** |
| **vs.** | **10:58 a.m. to 11:49 a.m.** |
| **NCL (BAHAMAS) LTD.,** | **Courtroom 12-2** |
| **Defendant.** | **(Pages 1 to 37)** |

---

**MOTION HEARING**
**BEFORE THE HONORABLE CECILIA M. ALTONAGA,**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

| | |
|---|---|
| **FOR THE PLAINTIFF:** | **MICHELLE Y. GURIAN, ESQ.**<br>**KEITH S. BRAIS, ESQ.**<br>**Brais & Associates, P.A.**<br>**9300 South Dadeland Blvd, Suite 101**<br>**Miami, FL 33156-2704**<br>**(305) 416-2901**<br>**kbrais@braislaw.com**<br>**mgurian@braislaw.com** |
| **FOR THE DEFENDANT:** | **DARREN W. FRIEDMAN, ESQ.**<br>**LIZBETH MICHEL-ESCANDELL, ESQ.**<br>**Foreman Friedman**<br>**2 South Biscayne Blvd, Suite 2300**<br>**Miami, FL 33131-1803**<br>**(305) 358-6555**<br>**dfriedman@fflegal.com**<br>**lizbeth_michel@hotmail.com** |
| **REPORTED BY:** | **STEPHANIE A. McCARN, RPR**<br>**Official Court Reporter**<br>**400 North Miami Avenue**<br>**Twelfth Floor**<br>**Miami, Florida 33128**<br>**(305) 523-5518**<br>**Stephanie_McCarn@flsd.uscourts.gov** |

**I N D E X**

**WITNESSES**

| WITNESSES FOR THE PLAINTIFF: | Page |
|---|---|
| | -- |

| WITNESSES FOR THE DEFENDANT: | Page |
|---|---|
| | -- |

| EXHIBITS IN EVIDENCE | PRE | MARKED | ADMITTED |
|---|---|---|---|
| Plaintiff's Exhibit No. | -- | -- | -- |
| Defendant's Exhibit No. | -- | -- | -- |

**MISCELLANEOUS**

| | Page |
|---|---|
| Proceedings...................................... | 3 |
| Court Reporter's Certificate...................... | 37 |

**(The following proceedings were held at 10:58 a.m.)**

**COURT SECURITY OFFICER: All rise.**

**THE COURT: Good morning. Please be seated.**

**Please state your appearances.**

**MS. GURIAN: Good morning, Your Honor, Michelle Gurian and Keith Brais on behalf of the Plaintiff.**

**MR. FRIEDMAN: Good morning, Your Honor, Darren Friedman on behalf of the Defendant.**

**MS. MICHEL-ESCANDELL: Lizbeth Michel-Escandell on behalf of the Defendant.**

**THE COURT: And I got the first name Michelle. What is your last name, please?**

**MS. MICHEL-ESCANDELL: No, the last name is Michel-Escandell. The first name is Lizbeth.**

**THE COURT: All right. Thank you.**

**All right. This is the Defendant's motion.**

**MR. FRIEDMAN: Good morning, Your Honor.**

**THE COURT: Good morning.**

**MR. FRIEDMAN: We filed a motion to dismiss the amended complaint. One of the issues we have actually just resolved, and I'll let Plaintiff chime in if I'm getting this wrong, but they have agreed that all references to the word "rape" should be taken out of the complaint.**

**THE COURT: All right.**

**MR. FRIEDMAN: And then, obviously, I don't know if**

**you want them to amend to clear that or if you just strike the language, but however you prefer, they have agreed to remedy that.**

**THE COURT: All right.**

**MR. BRAIS: Good -- good morning, Judge. I'm not going to be arguing today. I can barely hear myself think or talk. I have a really bad cold. I did just --**

**THE COURT: Maybe you might want to take the seat at the end of your table and that way --**

**MR. BRAIS: I know it.**

**THE COURT: -- Ms. Gurian --**

**MR. BRAIS: Occupational hazard of working for me today, that's for sure, and the last few days.**

**THE COURT: Okay.**

**MR. BRAIS: But I don't think we should waste the Court's time on quibbling with regard to the word "rape." It's -- the complaint was very -- or tried to be very specific on the issue that it was a sexual assault and battery. So the -- depending upon how you view other things today, that could easily be resolved by way of an agreed order as to removing a scrivener's error. Or if there is an amended complaint required, it could be incorporated into there as an agreed portion.**

**THE COURT: Very good. Thank you.**

**Mr. Friedman.**

**MR. FRIEDMAN: Okay. Additionally, Your Honor, we have argued that -- there's nine counts to this complaint. The majority of them deal with negligence. All of the negligence claims relate in some form or fashion to the strict liability claim as well. And as Your Honor has recognized in the *Garcia v. Carnival* case, when you have the same allegations for both negligence and strict liability, you don't get both. It essentially eviscerates the distinction between the two. And while, certainly, as Judge Scola recognized in a case cited to by the Plaintiff, you can't have negligence distinct from intentional tort, it's not distinct in this case. Because all of the allegations regarding negligent hiring or negligent detention or having a dead bolt that didn't work, they all relate to the harm of the strict liability tort occurring. If the strict liability tort didn't occur, then there is no damages relating to any of those alleged acts of negligence.**

**So the damages, that necessary component of all those negligence counts is the intentional tort. You can't have one without the other, which is why we believe that it's Counts 1 through 6 should all be dismissed because they are essentially duplicative of Count 7, which is the strict liability count. And we have not moved to dismiss the strict liability count. I'm well aware of what the law is. If the tort occurred, we are -- I'm sorry, if that -- yes, if that tort occurred, we are responsible for it. I just don't believe**

**that under the *Garcia* case and -- I believe there's two *Garcia* cases: your decision in *Garcia* and Judge Moore's decision in *Garcia*. You don't get both because it is essentially the same and to allow those eviscerates any distinction between the two.**

**THE COURT: Well, could the Plaintiff proceed on the negligence counts and not the strict liability count?**

**MR. FRIEDMAN: If that was their preference, sure.**

**THE COURT: Right. So why do they need to elect now at the pleading stage?**

**MR. FRIEDMAN: Because what -- what it would require right now is to do discovery that would otherwise be unnecessary. I mean, it's a waste of time and judicial resources, since they're going --**

**THE COURT: In the -- in what efforts you undertook to ascertain the background of this room steward and his priors, if any, and his pension for young girls, if any, which is not relevant to strict liability.**

**MR. FRIEDMAN: Exactly.**

**THE COURT: And distinguish for me, if you would, the -- how the negligence in Judge Scola's case was separate and apart from the strict liability there.**

**MR. FRIEDMAN: I'll be honest. I just don't agree with what Judge Scola found. So he found that claims of negligent hiring are distinct from strict liability, and my take on the law, Your Honor, there is no harm relating to the**

negligent hiring claim unless that person did something, unless he committed a tort, unless there is a damage related because, as we all know, damages are a necessary element for negligence; so if there are no damages caused by the act, there is no tort.

THE COURT: Right, but the acts constituting the negligence, those acts which fell below the standard of care are not duplicative of any actions that are required to prove the strict liability count.

MR. FRIEDMAN: I understand that. But because the damages relate to each other, the overall claim is exactly the same. There is no damage resulting unless there is the intentional tort and that being a necessary element of the negligence claim, they overlap.

THE COURT: So how is this different from other negligence cases that go to the jury on multiple theories of negligence, and all of the damages are all the same; they are one in the same.

MR. FRIEDMAN: Well --

THE COURT: But the plaintiff is entitled to have the jury answer questions and rule in her favor on one, perhaps not the other, but at the end of the day walk away with that same recovery of damages that -- and the damages are all the same.

MR. FRIEDMAN: I will give an example. They have an additional count for negligent infliction of emotional distress. Now, I don't think they have stated a cause of

action for that, but let's say they did. And in that action they're saying the doctor did something to me that caused me emotional stress and harm. That is a negligent count completely distinct from the intentional tort court. The jury could find --

THE COURT: I understand because the events --

MR. FRIEDMAN: Right.

THE COURT: -- are after --

MR. FRIEDMAN: Exactly.

THE COURT: -- the fondling takes place in the cabin.

MR. FRIEDMAN: Right. So that -- mm-hmm. And, additionally, Your Honor, they could find there are damages from that that are distinct from the damages caused by the individual committing the assault.

THE COURT: Right.

MR. FRIEDMAN: So that, I think, would be an example where you could have both the negligence claim and an claim for an intentional tort going to the jury because the damages are different. The act is different; they are succinct.

THE COURT: So wouldn't your argument be the same if a plaintiff was pursuing negligent hiring and then simple negligence. In every case of a negligent hiring and simple negligence, the damages presumably are the same, and your argument would be the same. You could never elect to proceed on different theories because the damages are all the same.

MR. FRIEDMAN: Well, I don't think the damages are all the same because, like I just gave the example --

THE COURT: Well, this example of the --

MR. FRIEDMAN: Right.

THE COURT: -- intentional infliction or negligent infliction of emotional distress, that was for an event that occurred after the sexual assault.

MR. FRIEDMAN: Right.

THE COURT: And involved other activities by other players.

MR. FRIEDMAN: Um-hmm. Right. And I understand the distinction, Your Honor. I guess my point would be following the law that I have seen from you and Judge Moore, maybe it is something that only applies when you have the negligence count and a strict liability count, that those two counts cannot be commingled when they are based on the same facts.

THE COURT: All right. Thank you.

MR. FRIEDMAN: Okay.

THE COURT: Why don't I hear from Plaintiff on that argument first, and then we'll continue with the remaining issues.

Ms. Gurian.

MS. GURIAN: Thank you, Your Honor. Do you prefer if we stand?

THE COURT: You may remain seated.

MS. GURIAN: Okay. Thank you. There is a big distinction between the two tortfeasors we would be claiming here versus the negligence counts as to the acts that NCL itself committed, whether it's the failure to conduct proper background checks, monitor the whereabouts of their employees, provide a functional lock in the room, versus the intentional tort committed by the crew member. It's not -- the test is not whether the damages are separate and apart; it is whether the acts are separate. And we are alleging separate negligent acts by NCL, separate and apart from the intentional torts committed by the crew member.

This is --

THE COURT: You are, indeed, but Mr. Friedman's argument is that the last element of your negligence causes of action, the resulting damages, are the same as those damages which you seek for strict liability, right?

MS. GURIAN: They are not always the same. I mean, they could be separated as far as -- I mean, like he says, we can separate the negligent infliction of emotional distress from the intentional tort. They're not necessarily always --

THE COURT: We're not talking about the emotional distress occasioned by her physical examination by other folks after.

MS. GURIAN: Okay.

THE COURT: We are talking about the negligence that

you're alleging the cruise line committed that all lead to the ability of this cabin steward to have access to the cabin and go ahead and engage in those sexual acts with this minor child.

MS. GURIAN: Understood, Your Honor. But as Scola said, there's allegations related to NCL's failure to act and -- and fulfill its duty to Plaintiff separate and apart from the intentional tort committed by the crew member. And as alluded to by Mr. Friedman, sorry, this is a pre-emptive end row around, you know, precluding our discovery into the various allegations we've made in the complaint. If the negligence counts are kicked out, they are inevitably going to fight any kind of discovery --

THE COURT: They're inevitably?

MS. GURIAN: Sorry, too fast. Inevitably going to object to any kind of discovery relating to their policies and procedures and how they looked into hiring this crew member and all --

THE COURT: Well, because all of that would be irrelevant, right?

MS. GURIAN: The Plaintiff --

THE COURT: I mean, all you have to prove is that this cabin steward went into this cabin several times and fondled this child, and you have your strict liability count established, right?

MS. GURIAN: Under the strict liability count,

correct. However, as you have said, Plaintiff -- we do not need to elect at this point under which one we are going to proceed under. If we eventually would decide that it is more favorable to proceed under the negligence counts, we should be entitled to that discovery and make that determination at a later point.

THE COURT: So why don't you distinguish for me, Mr. Friedman simply disagrees with Judge Scola's reasoning. Explain for me why it is that you think these two theories of recovery can move forward when -- as not about the intentional infliction or negligent infliction of emotional distress but about these other counts that we are talking about.

MS. GURIAN: I agree with how Scola describes it. The acts do not completely overlap. The failure to warn, NCL knew that these things were happening on their ships. They have known it for years. They know that it's been an ongoing problem and is an epidemic. They owed a duty to warn to -- sorry. To the Plaintiff and her family so that they could take proper precautionary measures and potentially avoid all of this from happening in the first place.

THE COURT: So the necessary acts don't complete ly overlap, but the damages are one in the same, correct?

MR. BRAIS: Judge, could I be heard just on one small point?

THE COURT: Of course.

**MR. BRAIS: The damages between the negligence counts, either for the perpetrator or for the cruise line, don't always overlap. And the necessity for the Plaintiff to not at this point in time have to elect between those two available remedies goes to the specifics of the negligence count against the cruise line.**

**If the cruise line's motivations behind their not hiring from reasonably well-developed countries where background checks are prevalent, if the cruise line's reasoning behind hiring from semi-impoverished nonwesternized countries is because the labor is so much cheaper as compared, those, for example, would lead to potential additional damages above normal tort damages in the sense of punitive damages. If there was a willful, arbitrary, capricious or malice intent despite a history, an epidemic history of these sexual assaults on these cruise ships, was motivated from an economic standpoint, and that took place, priority over why don't we hire from another country, why don't we hire from more westernized civilizations where their social norms are more in tune, perhaps, with our country.**

**If -- there's a recent case, Your Honor, the *KT v. Royal Caribbean* opinion from the Eleventh Circuit. You are probably very well aware of it. The Court goes on to basically say that there's an absolute epidemic of these sexual assaults. It goes to the Department of Transportations, and it looks to**

why these keep happening. And that why, and it's the why behind that, concerns the negligent acts different from the perpetrator, the negligent acts of the cruise line in deciding to continue with failed policies and whether those failed policies are driven for economic reasons.

The reality is it's cheaper, Your Honor, for a cruise line to pay a premium for their insurance even though they are with P&I to cover these kinds of things as opposed to reinvent a wage scale that would hire people from more westernized, UK, Australia, the United States.

But if you look at the epidemic that's going on on board these cruise ships, disproportionately that decision by the cruise line is linked to a disproportionate number of these sexual assaults upon, in this horrible case a minor, and other -- and passengers, adults as well, because it's economically more advantageous. So not in every case are the damages in a negligence count against the perpetrator or in a negligence count against the cruise line are the damages always going to be the same.

Now, if for some reason, we were not allowed to at either a later date elect or pursue simultaneously and have a jury answer a special verdict form on certain issues, then we would lose the ability to discover things that would go directly to the cruise line's motivations, discovery would be grossly limited on the negligence count, and we would never be

Case 1:19-cv-21486-CMA Document 52 Entered on FLSD Docket 10/04/2019 Page 15 of 37


able to get the facts we need before the jury on the issue of whether there was a basis upon which punitive damages should be sought here. So it's very, very premature to essentially do an end run around discovery to prevent a punitive claim later is kind of what's really happening here.

THE COURT: Thank you very much.

Mr. Friedman.

MR. FRIEDMAN: Yeah, two quick comments I need to make on that argument, and then I will move on to the next one. First, Your Honor, I just have to note for the record, I find the whole theory incredibly offensive to allege that hiring people from -- from countries that aren't western automatically means they are inclined to commit sexual assaults and rapes, and that is essentially the allegation that was just stated, and it's repeated throughout the complaint that hiring people from the third world and young men makes them somehow naturally inclined to commit a sexual assault.

Notwithstanding that, Your Honor, there is only a harm to the negligence count if the intentional tort of an assault occurred. Otherwise --

THE COURT: Yeah, but how would you address Mr. Brais's argument that they might be able to -- or the Plaintiff might be able to seek punitive damages that she can't obtain under the strict liability count?

MR. FRIEDMAN: One, well, we can get to the punitive

**damages argument now, if you want, but I think the Court -- and by that I mean the Eleventh Circuit and the Supreme Court -- has made it very clear that there is no punitive damages for a negligence claim. And that's what we're talking about. You are only allowed punitive damages for claims of intentional misconduct, and that is not what's alleged in the complaint. In fact, the only reference that's in the complaint to that, you know, catch phrase language of willful, wanton, et cetera, is in the final count for intentional infliction of emotional distress. So if he is trying to change the complaint and argue things that are not based on the actual amended complaint, then he should be seeking leave to amend.**

**THE COURT: All right. Did you have any other arguments, Mr. Friedman, you wanted to make on these points?**

**MR. FRIEDMAN: Not on these points, but I do have additional points on negligence itself.**

**THE COURT: All right.**

**MR. FRIEDMAN: If Your Honor is inclined to allow both negligence claims and strict liability claims, then we still have grounds to dismiss because they haven't alleged sufficient facts. If you look at the allegations within, for instance, their negligent hiring claim, they've basically said, and I could quote it, It's a young man, and we shouldn't hire young men or young men from third world countries. That is not enough under the law. And just yesterday we submitted notice**

**of supplemental authority, a case where I happen to agree with Judge Scola, the *Rigula* (phonetic) opinion, a negligent hiring claim where he said, You can't just give labels. You can't just give conclusions. You need some underlying facts.**

**If they had done the investigation that you wanted them to do, they would have found that this person had a prior arrest record, that he had committed prior assaults.**

**THE COURT: Well, how can the Plaintiff make those allegations prior to obtaining discovery?**

**MR. FRIEDMAN: Well, if they want to allege some kind of a claim, as Judge Scola said, they've got to do an investigation. They've got to do something to support their argument. And they don't even make the allegation that we would have found something in this individual's history. They simply say we shouldn't hire young men. And I don't think that's sufficient under the law to allow that type of a claim to go forward.**

**THE COURT: Thank you.**

**Let me hear from Plaintiff's Counsel on that argument.**

**MS. GURIAN: There is more in the complaint regarding the negligent hiring and retention of this individual. It's their systematic way of -- the procedure that they use to employe these individuals, the fact that the -- and it is not -- we are not trying to offend people that are not western saying they have a propensity to do these things. It's just a**

**known fact that some other countries have less infrastructure and less ability to provide the kind of information that's provided here with respect to an individual's criminal history or other things that would be relevant as to whether it's an appropriate person to hire for the cruise -- to work on your cruise ship.**

**It's also the way that they train and that this -- the crew member isn't monitored. He entered this room four times using his key card, which they have records of, and nobody's monitoring how many times he's going in, what he is going in for. There's other crew members in the hallway. There's -- nobody said anything; nobody did anything. That's all part of what they did in training and retaining and hiring these individuals.**

**THE COURT: Let me hear the remaining arguments you have, Mr. Friedman, on the negligence claims, if there is anything else.**

**MR. FRIEDMAN: Yeah, I would just point the Court to Paragraph 54, where they state: "He was 27 years old, incompetent or unfit to work due to age and gender in connection with substandard screening, hiring, training."**

**Those are labels and conclusions. There are no alleged facts. And that would be our final position concerning the negligence argument, Your Honor.**

**THE COURT: Okay. So let me give the parties my**

**thoughts and my decision on these negligence claims that are in this complaint.**

**First of all, the -- the Defendant's argument that relied on my own decision in *Garcia* would normally and under normal circumstances have persuaded me that the Plaintiff could not pursue these negligence claims here in the face of the strict liability counts. Except the Plaintiff now comes with -- with the benefit of a recent decision, the *Doe v. NCL* decision by Judge Scola just last year, where Judge Scola distinguished Garcia and allowed the Plaintiff there to proceed with these claims of negligence along with strict liability count under factual circumstances very similar to this case.**

**In light of *Doe v. NCL*, I cannot say as a matter of law that the Plaintiff fails to state plausible claims for relief under negligence theories because the Plaintiff also has a strict liability count. So I would reject the Defendant's argument and position that the negligence counts need to be dismissed in the face of the strict liability count and, of course, in doing so, recede from my own decision in Garcia, given this recent case law and the manner with which, albeit the Defendant objects, Judge Scola distinguished *Garcia* and allowed these claims to move forward.**

**I do agree, however, with the Defendant that the Plaintiff does not satisfy the necessary elements for a claim of negligent hiring. To allege negligent hiring you have to**

**state plausible facts that an appropriate investigation would have revealed the unsuitability of the employee for the particular duty to be performed or for employment in general, and that element of your negligent hiring claim is missing.**

**Your complaint does not have plausible facts that go to that element. And simply saying that they -- the cruise line hires from poor countries and the sorts of things that you've said, don't satisfy that. What would an appropriate investigation here have revealed? Did this person have priors in his country, whatever that might be, for engaging in sexually inappropriate activity or for liking young children? There's nothing. So the claim for negligent hiring is dismissed with leave to amend.**

**Next, Mr. Friedman?**

**MR. FRIEDMAN: Okay. The negligent infliction of emotional distress, Your Honor. They simply have not stated a cause of action. There are two different ways that you can claim emotional distress in relation to a negligence claim. One is you have physically sustained an impact, touching some -- something which caused emotional distressed. That's not what's alleged. Or alternatively what's known as the zone of danger or the bystander rule, which again is not what's alleged. Simply the facts of this case being in a medical center and being asked questions or being examined are not what qualify as the bystander rule. She was not a bystander. If**

anything, she would have been the actual recipient of the action. It's typically -- this cause of action is typically where something happens to somebody else and, you know, you witness the -- I don't know, the crime taking place, and you could have been hurt but you weren't, and then you sustain some type of physical impact from that. This simply just isn't a negligent infliction of emotional distress type of claim, and it doesn't belong here.

THE COURT: Thank you. I will hear from Plaintiff's Counsel.

MS. GURIAN: Yes, Your Honor. Our -- Janie Doe was 11 years old when this happened. And when it was -- when NCL was informed of the incident, she was obviously taken into security to be questioned. And within those first 30 minutes, they knew there was no penetration, no genital touching, no intercourse that took place in the assault. Still they required -- in over three and a half hours, they required her to remove all her clothes, and only over the mom's objection was she able to keep her underwear on. But it was -- so she physically was required to remove her clothes. While they were questioning her in the medical center, they came with a rape kit and placed her in the zone of danger of having to be physically, you know evaluated the way rape kits are, you know, executed and the possibility of having to undergo that experience despite them knowing she wasn't even alleging any kind of penetration or intercourse,

Case 1:19-cv-21486-CMA Document 52 Entered on FLSD Docket 10/04/2019 Page 22 of 37


**and NCL's crew was insisting that the rape kit be used, was insisting that her -- she be touched have these things be done. That is the zone of danger she was placed in, and it was completely unnecessary due to the -- because of the facts that they knew that she was reporting and what she was alleging occurred.**

**MR. BRAIS: Judge, we just finished -- if I may, Your Honor, because I know there's generally a one-person rule and I don't --**

**THE COURT: That's all right.**

**MR. BRAIS: We just finished the deposition of -- well, I shouldn't say we, NCL just finished the deposition of the minor yesterday. It was a difficult, I would say, nearly six hours. This subject of what took place in the infirmary and what was learned in 30 minutes versus what continued for another three hours or so was torturous at best to listen to. But the point before you, Your Honor, the only issue before you is whether the claim's been alleged properly.**

**THE COURT: Of course.**

**MS. GURIAN: If the *prima facie* elements have been pled. We submit that the *prima facie* elements have been pled. It was willful, wanton -- well, negligent and then we're going to move into the intentional. But the point is that at the minimum the conduct undertaken by NCL in the infirmary, there was a swab that she was -- there was an oral swab; there was**

**the rape kit placed in front of her; there was the forced insistence upon de-robing. She was allowed, at the insistence of the mother, to keep her panties on. She had to put something over herself. Allegedly there were, quote, Philippine nurses. There are no -- I did defense work for twenty years for every major cruise line. There are no -- there are no Philippine nurses. There are Philippines, as you I am sure well know, make up the bulk of the security staff. So the conduct within there -- the notion that a person who is subjected to this conduct, that such a claim only exists to a bystander, I think is without merit.**

**I think that a person who's subjected to this following the initial tort that we are talking about, the crime that was committed here, is a claim that can be brought by the minor in this case. And to the point about there is case law that talks about the necessity of pleading the manifestation of the impact of that conduct -- and I don't have it in front of me, but Ms. Gurian has it in front of her -- which details how that conduct, whether we are looking at it in the negligent context or in the intentional infliction, manifested in the -- in this minor child.**

**And that's, you know, that language that we set forth here comes directly from cases that look at these exact cases and how that what's called the impact rule under maritime law and the manifestation rule under maritime law, how that's been**

pled. That was tracked directly out of case law. So we do have the conduct. We do have the language with respect to manifestation. And we even have the egregiousness part of it in so far as the intentional infliction is concerned. I don't think an intentional infliction of emotional distress perpetrated against a person means everybody who's bystanding is the only person who can suffer from that. I don't think there's any case law to that effect.

THE COURT: So your theory is that she is placed in immediate risk of physical harm by viewing the rape kit, the rape test kit that's placed near her in the examination room, right?

MR. BRAIS: Well, not just that, but to use that as an example in your case, your illustration, Your Honor, that her apprehensions and a manifestation of anxiety and how that affected her knowing that there was this apparent insistence, after 30 minutes or first 30 minutes detailing there was no rape, was going to involve a physical examination of her genitalia, yes, did put her in a position and actually did manifest in a physical impact upon her in the sense of how it -- by physical impact, it's not somebody hitting something; it's how it manifests physically or emotionally or psychologically, which is what's detailed in that count.

THE COURT: Thank you.

Mr. Friedman.

MR. FRIEDMAN: Yeah, a couple of points, Your Honor. One, if they believe that the actions of the medical staff breached Norwegian's duty of care, they can certainly amend Count 1 of the complaint for negligence and list these as additional breaches. Not all breach of negligence creates a stand-alone claim for negligent infliction of emotional distress, and that is how they have pled this.

Under the law this is not a stand-alone claim. There was no risk of physical injury to her due to actions that occurred by somebody else. She was not a bystander. It is called the bystander rule for a reason: you have to be a bystander to an action that causes injury to a third party. That is not what we have here. Nor do we have the direct physical impact upon her due to an action in that medical center. And I'm not even sure I understand the theory that there was a box in the room that she thought may do something to her, which may have caused an injury down the road. If they want to amend Count 1, you've already given them leave to amend, they can add in to the alleged breaches that the doctor wasn't very nice and they took too long asking her questions, but it is not a stand-alone claim.

THE COURT: Why don't you move into the intentional infliction of emotional distress, and we will address both together.

MR. FRIEDMAN: Your Honor, the -- again, on the

intention infliction count, what they're -- the only allegations are about: they asked her a lot of questions; they took too long to ask the questions; they did an investigation. I can only imagine the flip would be we would be sitting here saying: they didn't ask any questions; they didn't do an examination; they didn't do an investigation. But it is a very large leap to say that this satisfies the criterial under the State of Florida, which is called a very, very high standard to say that this reaches that level where the Court would view these facts and yell outrageous.

And, Your Honor, I know you have ruled on this issue multiple times. There have been multiple cases where courts have discussed sexual assault situations and said while the facts may be horrible, it doesn't qualify as a claim for intentional infliction of emotional distress.

THE COURT: Well, and I've also in the past found that it would pass muster at the 12(b)(6) stage but granted summary judgment in favor of the Defendant allowing the claim to proceed.

MR. FRIEDMAN: You have done that as well, Your Honor, but I don't think this even passes the 12(b)(6) stage. The allegation's simply that a doctor performed an examination, and a security officer asked questions. It's not outrageous even on its face.

THE COURT: Thank you.

I'll hear from Plaintiff.

MR. BRAIS: So I might be in a little better position because I was at the deposition yesterday and we learned things --

THE COURT: Except I don't have those, and let's go by what you have in the complaint.

MR. BRAIS: Sure. Sure. What we have in the complaint, Your Honor -- what I was leading to was is if there was an amended complaint coming in the way, I learned things yesterday.

THE COURT: All right.

MR. BRAIS: But to respond to what you're --

THE COURT: So you could embellish on just how outrageous and wanton the conduct was.

MR. BRAIS: I absolutely -- I'll represent to the Court that and I'm proffering that what we learned yesterday in the deposition would add fairly immensely to the allegations which we thought we knew and which I submit to you are clearly sufficient for -- we are still under a notice provision under -- in these counts. So -- so in so far as what's in the complaint, does -- and knowing the -- and all allegations accepted as true, 30 minutes seems to be a reasonable period of time to have discovered, after having been told three times in 30 minutes, that this was not a rape, which seemed to be sufficient, which begs the question why the torturous

**additional three hours.**

**After disclosing that there was no, either digital or penal, penetration of her genitalia, it seems what in God's creation is the purpose behind putting a rape kit and what's associated with the exam involved in a rape kit in front of, in front of, right next to an 11 year old? What's the purpose behind -- and then, I guess, the remainder -- oh, and the disrobing. I don't -- why she has to get effectively disrobed or required to strip, however the words might have been pled in the complaint, under these facts goes beyond the pale. I don't know what the purpose behind that was and, by the way, it was only at the insistence of the mother that even she was allowed to keep her panties on.**

**So just those three things seem to go -- and there's more, seem to go quite far enough for at least the pleading stage of the litigation to at least give rise for that complaint to survive, if we remember she was 11 years old, which is a particularly -- egregious.**

**THE COURT: Thank you.**

**Mr. Friedman?**

**MR. FRIEDMAN: Your Honor, as has happened now multiple times, Plaintiff seems to feel the need to discuss facts outside of the complaint to support his complaint. What had took place in the deposition yesterday has no bearing upon the motion to dismiss stage, and if he has to rely upon those**

**outside facts, it only evidences my point that there is not enough within this complaint to state a cause of action. And I don't think on the reading of the complaint -- which simply says she was interrogated by officers for three hours; she was examined in the medical center -- I think the natural reaction to that is, that's exactly what they should be doing when somebody claims they were sexually assaulted. It certainly is not beyond all bounds of decency and asking for the Court to scream outrageous.**

**MR. BRAIS: I think there's more than what Mr. Friedman references, at pages -- under Count 9 -- I'm sorry, Judge -- under Paragraph 90A through G than what Mr. Friedman is referencing right now.**

**THE COURT: So these two counts are -- are troubling. They're -- I tend to agree with the Defense, with regard to the negligent infliction of emotional distress, that having this rape kit test or test kit near you intended for you, I don't see how that satisfies the zone of danger test. Your claim of -- in Count 8 is predicated upon negligent infliction of emotional distress. And certainly there's no physical impact upon her, and you must necessarily rely on zone of danger where you are allowed recovery if you're -- if you sustain a physical impact or are placed in immediate risk of physical harm. And viewing a rape test kit does not place you in immediate risk of physical harm. It's just there in the examination room.**

**MR. BRAIS: And did, according to the allegations of the complaint, manifest itself in physical harm, emotional, psychological harm to her as has been alleged in that count. So, I could go to that paragraph if it's helpful, Judge.**

**THE COURT: No, no, no. I've seen it. I've seen it. The test kit is placed there, and she suffers harm, emotional harm and distress. It's --**

**MR. BRAIS: Paragraph 86 at the top of Page 27 goes on "experienced in the past extreme" --**

**THE COURT: Right.**

**MR. BRAIS: -- "anxiety, fear, fright, embarrassment, mental and emotional anguish. And according to what she testified yesterday, the apprehensions she felt, how she viewed that, knowing what it meant by way of an apparent insisted physical examination of her genitalia caused her sheer panic."**

**Now, if we need to fix that in the -- by way of the amended complaint with the information learned yesterday, we could certainly do that.**

**THE COURT: And the intentional infliction of emotional distress, I understand how you've characterized it, but the conduct has to be outrageous, and you describe it as such. So while I think we are going to be revisiting these two counts, certainly at the summary judgment stage, if the -- you survive -- I don't think you need to amend either one -- they are problematic because you barely squeak by with these, quite**

**frankly. I think on a motion for summary judgment, I would be hard-pressed to deny the Defendant summary judgment on the intentional infliction of emotional distress count.**

**We will proceed with this rape kit putting Janie Doe in a zone of danger for purposes of Count 8, I believe it is. I don't think we need to have you amend to state that which the parties already know occurred and was described yesterday at the deposition.**

**Mr. Friedman, your remaining arguments.**

**MR. FRIEDMAN: Just one point I need to make just to clarify for the record. The box doesn't say rape kit, and the word "rape" is not mentioned anywhere on the box or anything to do with it. I know it's colloquially referred to that way. But I need to clarify for the record that the word "rape" is not anywhere on this. The box simply says "sexual assault," and this is an alleged sexual assault.**

**THE COURT: Right.**

**MR. FRIEDMAN: And then our final argument concerns punitive damages, Your Honor. Post *Batterton* from the Supreme Court, post *Eslinger* from the Eleventh Circuit. And if I may just read briefly from *Eslinger*, "Plaintiffs may not recover punitive damages for personal injury claims under federal maritime law." I mean, that's -- that's as plain of English as it gets.**

**THE COURT: Did you want to address Plaintiff's**

Case 1:19-cv-21486-CMA Document 52 Entered on FLSD Docket 10/04/2019 Page 32 of 37


**supplemental authority in *Noon v. Carnival (phonetic)?***

**MR. FRIEDMAN: Sure. The *Noon* case doesn't reference *Eslinger*. It's not even discussed, referenced or mentioned. Judge Torres, I think, just missed it. He read *Batterton*. I disagree with his reading of *Batterton*, but I think you have to read *Batterton* in conjunction with the Eleventh Circuit in *Eslinger*. And I think the only way that you could allow any kind of punitive damages to go forward at this point is to say, well, the Eleventh Circuit didn't mean what it said, and they meant to do a carveout for intentional torts; they just forgot to say it.**

**But the plain language from the Eleventh is personal injury case, which is what we have here, you have no punitive damages. My reading is that punitive damages now only remain for *Atlantic Sounding* on a case for intentional withholding of maintenance and cure, not in a case like this.**

**I will just note additionally, Your Honor, they asked for punitive damages on all counts.**

**THE COURT: Correct.**

**MR. FRIEDMAN: So even if the Court believes the Eleventh Circuit just forgot some of the language and meant it for the strict liability count, I think there is no argument that punitive damages aren't applicable to all of the negligence claims.**

**MR. BRAIS: I'm sorry. I didn't hear that, Judge.**

**What?**

**THE COURT: If you could repeat that, Mr. Friedman.**

**MR. FRIEDMAN: Sure. If the Court were to find that the Eleventh Circuit simply didn't complete their thought and maybe meant to include an exception for intentional torts, there would be no punitive damages available for all of the negligence counts, and as pled they've asked for punitive damages on all nine counts of the complaint.**

**THE COURT: Thank you.**

**I will hear from Plaintiff.**

**MR. BRAIS: Judge, I can only address -- I'm going to let Ms. Gurian deal with half of it because I only know half of the equation. *Batterton* is a Jones Act seaman case where he sought punitive damages under a general maritime law claim of unseaworthiness. We don't -- we're not dealing with a seaman; we are not dealing with an unseaworthiness case, and we're not dealing with the perplexing issue of the overlap or conflicting damages between the Jones Act seaman's claims in an unseaworthy context versus Jones Act which is what's always wrestled with in those cases. So the facts couldn't be any more different insofar as the parties are concerned and insofar as the claims are concerned.**

**That's probably -- I don't have a chance -- I didn't have a chance -- I'm going to let Ms. Gurian address the supplemental authority that we provided you that I -- so far as**

I understand addresses the very same issue that's before this Court, and I'll let Ms. Gurian address the issue with regard to this opinion.

MS. GURIAN: The Defense is simply citing to one specific sentence that standing alone from that case, as we said in our reply -- in our response, yes it would stand for that proposition. But looking at the case law as a whole, including the supplemental case law that we provided yesterday and the other cases cited within our response, it's very clear that punitive damages are allowed in maritime tort claims. The -- or you already said that due term part, but it's -- there -- you cannot isolate one sentence from an opinion and call it law when the remaining law that has been cited and has been -- come out since then allows for punitive damages in maritime tort claims.

MR. BRAIS: I think there's one other thing, Your Honor. I actually disagree with Mr. Friedman, who I like and respect a lot, on the issue of under which claims punitive damages would be available.

I could be wrong, but it's always been my impression that under a strict liability case, you couldn't pursue punitive damages. But under negligent counts where there has been the -- the conduct has given rise to the, we'll call it outrageous -- I won't go through the willful, wanton and all the other words that need to be in there -- those are the very

**counts where a punitive damages claim would be permitted. It would not, last I checked, under a strict liability count. So if it's pled, is available under the strict liability, then I don't think that would even be -- I don't think that's right unless I'm wrong. And my junior partner always corrects me, so I'll let her do that now if she wants to, but that's my understanding.**

**THE COURT: I was somewhat surprised that the *Noon v. Carnival* decision entered on August 12 did not reference *Eslinger*. I don't know how you can -- I can reconcile the ruling in *Noon* with the very clear sentence in *Eslinger*. Judge's Martin, Newsom, and Dubina wrote "Our Court has held that Plaintiffs may not recover punitive damages for personal injury claims under federal maritime law." That's what the Plaintiff is attempting to do in this complaint. And I will follow *Eslinger* as I am required to. I am bound to follow Eleventh Circuit law. I don't see any ambiguity in the sentence. I don't see any reservation or carveout. And so the --**

**MR. BRAIS: I have to plead ignorance to that case, Your Honor. And I apologize.**

**THE COURT: I'm sorry.**

**MR. BRAIS: I have to plead ignorance to that. I don't know if it was a personal -- yeah, I don't know if it was a passenger case pled under general maritime law, and I**

**apologize for that.**

**THE COURT: She sued Celebrity Cruises, and her claim for loss of consortium was dismissed. And so, as I said before, I am bound by Eleventh Circuit law. I believe this panel wrote the sentence very clearly, and I will follow that. And so the request for punitive damages here are stricken.**

**MR. BRAIS: But, Your Honor, may I ask a question?**

**THE COURT: Yes.**

**MR. BRAIS: Did I hear you say that the -- that opinion concerns a claim brought for the recovery --**

**THE COURT: Loss of consortium.**

**MR. BRAIS: -- of non-pecuniary damages? Loss of consortium?**

**THE COURT: Right. But the Court did not limit its statement. It simply said, "Plaintiff may not recover punitive damages, comma, including loss of consortium damages, comma, for personal injury claims under federal maritime law." The Court simply could have limited itself to loss of consortium and did not. So with that being the Eleventh Circuit's pronouncement just this June, there are no punitive damages here.**

**How much time would the Plaintiff like to amend the negligent hiring claim?**

**MR. BRAIS: Does anybody know what this storm is going to do?**

Case 1:19-cv-21486-CMA Document 52 Entered on FLSD Docket 10/04/2019 Page 37 of 37


THE COURT: I say it's not coming, but I'm always wrong when I say things like that.

MR. BRAIS: Oh, well, I'm with you, Judge.

THE COURT: All right. How about --

MR. BRAIS: How does ten days sound?

THE COURT: Ten days is perfect. Very good.

Is there any other issue we did not address? And when you do that, you can take out the references to the rape which did not occur.

MR. BRAIS: We'll do that, Judge.

THE COURT: All right. Anything else?

MR. FRIEDMAN: That's all. Thank you for your time, Your Honor.

THE COURT: Thank you. Nice to see you all.

MS. GURIAN: Thank you, Your Honor.

THE COURT: You all have a good day.

(The proceedings adjourned at 11:49 a.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

_10/02/19__
DATE

STEPHANIE A. McCARN, RPR
Official United States Court Reporter
400 North Miami Avenue, Twelfth Floor
Miami, Florida 33128
(305) 523-5518